# EXHIBIT   A

## IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT
## IN AND FOR MIAMI-DADE COUNTY, FLORIDA

**EDUARDO MARTINEZ and DANIEL GRANDE, behalf of themselves and all others similarly situated,**

      **Plaintiffs,**

**v.**

**SOUTH FLORIDA STADIUM LLC, d/b/a HARD ROCK STADIUM, CONFEDERACION SUDAMERICANA DE FUTBOL, d/b/a CONMEBOL, CONFEDERATION OF NORTH, CENTRAL AMERICA AND CARIBBEAN ASSOCIATION FOOTBALL D/B/A CONCACAF, and BEST CROWD MANAGEMENT, INC.,**

      **Defendants.**

**CASE NO.: 2024-013325-CA-01**

**CLASS ACTION**

**JURY DEMAND**

## FIRST AMENDED COMPLAINT FOR DAMAGES
## AND DEMAND FOR JURY TRIAL

Plaintiffs, EDUARDO MARTINEZ and DANIEL GRANDE on behalf of themselves and all other similarly situated files this Class Action Complaint against Defendants, South Florida Stadium LLC d/b/a Hard Rock Stadium ("Hard Rock"), Confederacion Sudamericana De Futbol d/b/a CONMEBOL ("CONMEBOL"), Confederation of North, Central America and Caribbean Association Football d/b/a Concacaf ("Concacaf"), and BEST Crowd Management, Inc. ("BEST"), (together as "Defendants"), as follows:

## INTRODUCTION

> It was a life-or-death situation. Let the people get crushed or open the gates. Then it became total mayhem in there. It was a calamity of errors on all levels.
>
> — Steadman Stahl, Police Union President of the South Florida Police Benevolent Association.

1.      This Complaint seeks redress for a class of invitee fans who paid money to attend the Copa America Final football match between Argentina and Columbia ("Final Match") at Hard Rock Stadium but were denied entry because of Defendants' failure to implement adequate security protocols that resulted in mass chaos, injuries, and ultimately, the Defendants' decision to open the stadium to thousands of unticketed fans and to exclude ticketed invitee fans like Plaintiffs and the Class Members.

2.      Plaintiffs and the Class Members paid thousands of dollars for tickets and travel accommodations to attend the Final Match.

3.      This class action does not seek damages related to any personal injuries.

4.      The Copa America Final Match was held at Hard Rock Stadium on July 14, 2024. Defendants sold over 65,000 tickets to invitees like Plaintiffs to attend the Final Match at Hard Rock Stadium in Miami Gardens, Florida.[1]

5.      Following the Defendants selling out every seat at the Hard Rock Stadium for the Final Match, Defendants' decisions caused or allowed civil unrest through the following actions or inactions: (1) failure to implement an adequate and reasonable security and safety plan; (2) failure to hire an adequate number of security persons; (3) failure to predict scope and scale of

---

[1] https://www.theguardian.com/football/article/2024/jul/15/fans-receive-medical-treatment-at-copa-america-final-after-issues-outside-ground#:~:text=We%20are%20actively%20working%20with,of%20the%20South%20American%20tournament.

unticketed attendees present for the Final Match; (4) failure to establish a permitter; (5) failure to establish ticketed checkpoints, barriers and fences; (6) permitting parking for ticketed and unticketed invitees around Hard Rock Stadium; (7) permitting watch parties and gatherings for unticketed invitees outside of Hard Rock Stadium; (8) willfully and knowingly permitting unticketed fans to enter Hard Rock Stadium; (9) willfully and knowingly denying ticketed fans entrance to the Hard Rock Stadium; (10) failure to cancel the Final Match to ensure the safety, security, and attendance of ticketed fans; and (11) other security and safety protocol failures that will come to light during discovery.

6.      As a direct result of Defendants' failures to implement appropriate security and safety measures and the decision to open the gates to unticketed fans that invaded the Hard Rock Stadium, Defendants permitted unticketed fans to steal the seats paid for by Plaintiffs and the Class. Specifically, Defendants admitted thousands of unticketed fans and as a result, denied entry to thousands of ticketed fans, including Plaintiffs and the Class.

7.      Plaintiffs seek to represent all ticketed persons that Defendants denied entry into the Final Match. Plaintiffs and the proposed Class were damaged as a result of Defendants' negligent conduct and seek redress by way of a full refund of their ticket purchases, plus interest, and damages incurred as a result of their corresponding travel expenses. In the alternative, Plaintiffs seek disgorgement of all profits that Defendants generated from the sale of the Class Members' tickets, as allowing Defendants to retain profits from Plaintiffs and Class Members' purchases would unjustly enrich the Defendants.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to Fla. Stat. § 48.193 as the Defendants conduct business within the State of Florida and the cause of action arises from Defendant's activities within the State.

9.      Venue is proper in this Court pursuant to Fla. Stat. § 47.011 because the events giving rise to this Complaint occurred in Miami-Dade County, Florida

10.      Plaintiff Eduardo Martinez is a natural person on living in Miami-Gardens, Florida. At all times material hereto, Mr. Martinez was a citizen of Florida.

11.      Plaintiff Daniel Grande is a natural person on living in Miami-Gardens, Florida. At all times material hereto, Mr. Grande was a citizen of Florida.

12.      Defendant South Florida Stadium LLC d/b/a Hard Rock Stadium is a Florida Limited Liability Company. Its principal place of business is 347 Don Shula Drive Miami Gardens, Florida 33056. Stephen Ross and the family of Wayne Huizenga are the sole owners and members of South Florida Stadium LLC. For citizenship purposes, Ross and the Huizenga family are citizens of the State of Florida. At all times material hereto, Hard Rock owned and operated the Hard Rock Stadium located Miami-Dade County, Florida and availed itself of Florida law, and routinely profited from doing business in Miami-Dade County and under the laws of the State of Florida. Accordingly, the Hard Rock Stadium is subject to general jurisdiction in this District.

13.      Defendant Confederacion Sudamericana De Futbol D/B/A CONMEBOL is an association of ten national soccer associations from Argentina, Brazil, Bolivia, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela. CONMEBOL is organized under the laws of Paraguay as a non-profit and non-governmental entity. At all times material hereto, CONMEBOL conducted business in the State of Florida and Miami-Dade County, availed itself to Florida law,

and profited from its business in Miami-Dade County and under the laws of the State of Florida. Because CONMEBOL was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

14.    Defendant Confederation Of North, Central America And Caribbean Association Football D/B/A Concacaf is an association of forty-one national soccer associations from North America, Central America, and the Caribbean Islands. Specifically, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bonaire, British Virgin Islands, Canada, Caymen Islands Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vincent and the Grenadines, Sint Maarten, Suriname, Trinidad and Tobago, Turks and Caicos Islands, United States of America and U.S. Virgin Islands. Concacaf is organized under the laws of the Bahamas as a non-profit and non-governmental entity. At all times material hereto, Concacaf conducted business in the State of Florida and in Miami-Dade County, maintained a principal place of business and registered agent within the State of Florida, availed itself to Florida law, and profited from its business in Miami-Dade County and under the laws of the State of Florida. Because Concacaf was doing business in Florida for the specific purpose of presenting the Final Match, it is subject to specific jurisdiction within this District.

15.    Defendant BEST Crowd Management, Inc. is incorporated in Missouri and maintains its principal place of business in Missouri. At all times material hereto, BEST was hired by the other Defendants to secure and protect ticketed fans like Plaintiffs and the Class at Hard Rock Stadium located in the State of Florida and Miami-Dade County, availed itself to Florida

law, and profited from doing business in Miami-Dade County and under the laws of the State of Florida.

## GENERAL FACTUAL ALLEGATIONS

### I.     FIFA Confederations

16.     Founded in 1904, FIFA's world governing body was created to unite national football associations.[2]

17.     Under FIFA's governance, football has become the world's most popular sport, with 150 million registered athletes and viewed regularly by billions of fans in stadiums and on televisions worldwide.[3]

18.     As football's administrative authority, FIFA governs all facets of the game: regulating the rules of play, transfers of players internationally, organizing international competitions such as the FIFA World Cup[4], establishing standards for referees, coaching and sporting medicine, and encouraging football's development around the world.[5]

19.     FIFA's members are split up geographically into six regional confederations: (1) Africa (CAF), Asia (AFC), Europe (UEFA), South America (CONMEBOL), Oceania (OFC), and North America, Central America and the Caribbean (Concacaf).

### II.    CONMEBOL

20.     CONMEBOL is the continental governing body of football in South America and is the oldest confederation in the world.[6]

---

[2] https://www.ussoccer.com/history/organizational-structure/fifa
[3] *Id.*
[4] Prior to the Mayhem at the Final Match, Hard Rock Stadium was selected to host the FIFA World Cup in 2026.
[5] https://www.ussoccer.com/history/organizational-structure/fifa
[6] https://analyisport.com/insights/what-is-conmebol-south-america/

21.    CONMEBOL is made up of ten national football associations from Argentina, Brazil, Bolivia, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay, and Venezuela.

## III.    Concacaf

22.    Concacaf formed in 1961 through the merger of the Football Confederation of Central America and the Caribbean and the North American Football Confederation and consists of three sub-regions: North America, Central America, and the Caribbean.

23.    Concacaf is made up of forty-one national football associations from North America, Central America, and the Caribbean Islands. Specifically, Anguilla, Antigua and Barbuda, Aruba, Bahamas, Barbados, Belize, Bermuda, Bonaire, British Virgin Islands, Canada, Caymen Islands Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Puerto Rico, Saint Kitts and Nevis, Saint Lucia, Saint Martin, Saint Vincent and the Grenadines, Sint Maarten, Suriname, Trinidad and Tobago, Turks and Caicos Islands, United States of America and the U.S. Virgin Islands.

## IV.    The Copa America Tournament

24.    The Copa America Tournament is the top football tournament among national teams from South America. The first Copa America Tournament was held in 1916 to honor the 100-year anniversary of Argentina's independence. The tournament took place every one to four years until it adopted its quadrennial format in 2007.

25.    In 2016, the Copa America Tournament was played for the first time in the United States.[7]

---

[7] https://www.prnewswire.com/news-releases/historic-2016-copa-america-centenario-delivers-record-breaking-event-300289950.html

26.     The 2016 Copa America Tournament set the benchmark for attendance and revenue, setting new records for total and average attendance, television viewership in the United States and throughout the world, and digital and social media engagement.[8]

27.     In 2016, the Copa America Tournament was structured and run by Concacaf.

28.     As a result of the revenue and viewership received in 2016, the Copa America Tournament returned to the United States in 2024.[9]

29.     In 2024, the Copa America Tournament was held at various locations across the United States from June 20 to July 14, 2024 bringing together 16 nations – 10 from South America and Six qualifiers from Concacaf.[10]

30.     The Copa America 2024 Tournament was comprised of 32 matches in 14 different cities/stadiums spanning both coasts of the United States.[11]

31.     The Copa America 2024 Final Match was scheduled to be played at the Hard Rock Stadium in Miami, the same venue that has been chosen to host the 2026 FIFA World Cup.[12]

32.     Notably, instead of Concacaf hosting the Copa America 2024 Tournament, CONMEBOL, with a fraction of the resources of its U.S. based counterpart, took over the planning, scheduling, structure, and coordination of the Copa America Tournament in 2024.

---

[8] *Id.*
[9] https://copaamerica.com/en/match-schedule
[10] https://www.mlssoccer.com/news/2024-copa-america-host-cities-stadiums-schedule
[11] *Id.*
[12] https://www.hardrockstadium.com/events/fifa-world-cup-2026/

V.      **Defendant CONMEBOL's Contract with Defendant Concacaf**

33.     CONMEBOL and Concacaf executed a strategic collaboration agreement in 2023, in which the United States was selected to host the 2024 Copa America Tournament at the Hard Rock Stadium.[13]

34.     The purpose of the collaboration agreement was to strengthen and develop football in both regions.[14]

35.     The one difference between the 2016 Copa America Tournament and the 2024 Copa America Tournament is that in 2016, Concacaf hosted and planned the entire tournament. As a result, Concacaf set new revenue and viewership records. CONMEBOL witnessed the revenue achieved from the 2016 Copa America and decided to seize its opportunity in 2024 with a plan to take the Copa America Tournament back in the United States, but this time it would plan and control the event itself and also retain a larger share of the revenue generated.

36.     CONMEBOL and Concacaf's joint decision to let CONMEBOL's confederation host and plan one of the largest football events in world, including with its limited resources and experience, placed profits over the safety and security of its fans.

37.     Hard Rock was awarded the Copa America Final Match and several games within the Tournament. The Copa America Tournament being held at the Hard Rock was only the second time that this 100-year-old tournament was held outside of South America.

38.     Adding to the excitement of holding the Copa America Tournament at the Hard Rock, is the surgency of Lionel Messi ("Messi") fandom as he joined the MLS team Inter Miami

---

[13] https://www.concacaf.com/news/conmebol-and-concacaf-sign-strategic-collaboration-agreement/
[14] https://www.concacaf.com/news/conmebol-and-concacaf-sign-strategic-collaboration-agreement/

for the 2023-2024 season. Messi also plays for Argentina, a team competing in Copa America. Argentina would go on to advance to the Copa America championship, attempting to win its record, 16th Copa America title.

39.    Opposite Messi and Argentina in the Copa America championship was Columbia who was attempting to secure its first Copa America title since 2001.

40.    When announcing the Hard Rock as the site of the Copa America, CONMEBOL stated that it expected "stadiums filled with the passion of the entire American continent for the inauguration and the final."

41.    Ahead of the Copa America, Hard Rock Stadium President and Chief Executive Officer, Tom Garfinkel acknowledged the large crowds expected stating "Obviously, with a large Colombian and Argentinean population here in South Florida, the demand for this event has been huge."

42.    Consistent with this level of excitement, Defendants increased profits dramatically and ticket prices surged to $7,377 for the most expensive ticket and a whopping $1,995 for the least expensive ticket.[15]

43.    Despite being aware of the momentous occasion to take place at the Hard Rock, Hard Rock and CONMEBOL failed to devise an adequate security plan to control the tens of thousands of loyal fans that descended upon the Hard Rock Stadium. In particular, unticketed fans attended in droves.

44.    When the stars aligned for the Copa America final (Messi and Argentina making the Final Match), as though CONMEBOL and Hard Rock drew up the play in the locker room,

---

[15] https://www.nbcmiami.com/news/sports/soccer/copa-america-final-times-ticket-prices-halftime-performance-and-more/3358622/

Defendants still failed to revise their security plan to control the tens of thousands of unticketed fans that descended upon Hard Rock Stadium.

## VI.    Hard Rock Stadium and BEST Security

45.    The Hard Rock Stadium is a multi-purpose stadium located in Miami Gardens, Florida with a capacity of 65,326. Hard Rock is the home stadium for the Miami Dolphins and the Miami Hurricanes and regularly holds sporting events, concerts, racing, and other events.

46.    Defendants CONMEBOL, Concacaf, Hard Rock, and BEST are no strangers to violence at football matches. All are aware of the world-wide history of violence that is possible at football matches when stadiums, security and tournament organizers fail to provide adequate security. In the 1989 Hillsborough Disaster, 97 Liverpool fans died as the result of a spectator crush. In 1996 more than 80 fans died at a World Cup qualifier between Guatemala and Costa Rica.

47.    Just three days before the mayhem at Hard Rock Stadium, CONMEBOL had opened an investigation into a bleacher brawl involving Uruguay players and Columbian fans at the Copa America Semi-Final ("Semi-Final Match") held at Bank of America Stadium in Charlotte, North Carolina. The Semi-Final brawl involved dozens of fans, players and security. Following the Semi-Final brawl, CONMEBOL released the following statement:

> On the eve of the final of Copa América, we want to reaffirm and warn that no action will be tolerated that tarnishes this global football celebration, which involves both the players and the fans present in the stadium, and which will be watched by hundreds of millions of viewers worldwide.
> It is unacceptable that an incident like this turns passion into violence. Therefore, no behavior that harms the sporting competition and the most beautiful spectacle in the world, which belongs to the entire football family, will be tolerated.[16]

---

[16] https://www.nytimes.com/athletic/5632635/2024/07/11/colombia-uruguay-copa-america-nunez-clash/

48.     Rather than increasing security to control the violence, Defendants opened the doors to the general public and invited them to be part of the Final Match, regardless of whether they had purchased tickets.

49.     Upon information and belief, Hard Rock and BEST security allowed thousands of fans without tickets to park on Hard Rock Stadium property increasing the volume of non-ticket holders on Hard Rock property.

50.     Upon information and belief, Defendants failed to establish a perimeter outside of the stadium (barricades, fences, metal detectors, ticket scanners, block parking lots, funnel fans to checkpoints, etc.) as is typical for major football matches around the world, including the European championship.

51.     Upon information and belief, CONMEBOL was responsible for organizing the 2024 Copa America Tournament, selected Hard Rock as the site for the final, and approved Hard Rock's security plan. Concacaf contracted with CONMEBOL and was involved through its own action or inaction and knew or should have known that Hard Rock's security plan was inadequate.

52.     CONMEBOL entered into a contract with Hard Rock to host the 2024 Copa America Final Match and spent over a year promoting, marketing, and selling tickets for the events.

53.     Upon information and belief, Hard Rock Stadium was responsible for implementing the security plans negotiated with CONMEBOL and Concacaf and implementing protocols designed for fan safety. Hard Rock Stadium hired BEST security for additional assistance. On information and belief, BEST Security assisted in the development and implementation of the security plans developed and agreed upon by Hard Rock Stadium, CONMEBOL and Concacaf.

54.     The Hard Rock websites stated the following with respect to the Copa America final:[17]

> Fans MUST have game tickets to enter the Hard Rock Stadium parking lots on match day. **There will be no watch parties outside the stadium or in the parking lots.** Fans with tickets are encouraged to come early.

55.     Contrary to this statement, on the Final Match gameday, tens of thousands of unticketed fans poured to the Hard Rock Stadium area to attend watch parties, tailgate, and crowd the stadium area.

56.     The Final Match gameday was filled with unticketed fans whom Defendants permitted to walk to the entrance of the Hard Rock Stadium.

57.     At some point, the ticketed and unticketed fans amassed to the point where Defendants were concerned that fans would be killed or severely injured. As a result, the Defendants opened the stadium gates and permitted unticketed fans to avoid metal detectors and to enter the stadium without tickets.

58.     The scene that unfolded on television and social media was astonishing, bloodied fans, parents protecting children from criminal acts, fans assaulting each other, stadium staff and local police.

59.     Ultimately, the Defendants' failure to have a proper security plan allowed unticketed fans to enter the stadium.

60.     At some point, in an effort to regain control, Defendants closed all gates and locked thousands of properly ticketed fans out.

61.     According to Hard Rock this was done to "avoid a stampede." However, a stampede was only made possible by Hard Rock's failure to implement reasonable and adequate security

---

[17] https://www.hardrockstadium.com/parking/copa-america/

measures throughout the day and within the surrounding area of the stadium. The gate closures only led to more problems as some fans began breaking down walls and barricades. This was exceedingly dangerous.

62.     Although Hard Rock attempted to "strategically" reopen some entrances, it was soon forced to close the entrances again once the stadium was at capacity due to unticketed individuals being allowed in, leaving thousands of paying customers, including Plaintiffs and the Putative Class, wrongfully excluded from the stadium.

63.     Because of Defendants' failure to implement adequate security measures, Defendants were wholly unable to remove the volume of unticketed fans that they allowed to enter the stadium. As a result of the Defendants acts and omissions, the unticketed fans took the seats of Plaintiffs and the Class.

64.     CONMEBOL officials have stated that it was "subject to the decisions made by the Hard Rock Stadium authorities, according to the contractual responsibilities established for security operations" and that CONMEBOL's recommended security measures "were NOT taken into account" by Hard Rock and BEST. This statement shows that all Defendants were involved in designing and implementing the security plan which was wholly inadequate and caused the mayhem, violence and damages to Plaintiffs and the Class.

## VII.    Plaintiffs Martinez's Facts

65.     Plaintiffs Martinez lives in Miami-Gardens, Florida only 15 minutes away from the Hard Rock stadium.

66.     Plaintiff Martinez hails from Columbia and is a life-time Columbian national team supporter.

67.     On May 17, 2024, Plaintiff Martinez four purchased four tickets to the Copa America Final for $4,395.59. Plaintiff Martinez's tickets were located in Section 106, Row 14 A copy of the receipt showing the Plaintiff Martinez's purchase is attached as **Exhibit A**.

68.     In addition to the ticket costs, Plaintiff Martinez incurred travel costs in order to travel from his home to the Hard Rock stadium.

69.     On July 14, 2024 at 6:00 p.m. Plaintiff Martinez and his family traveled to Hard Rock stadium. When they arrived in the parking lot, they were surprised to find that no attendee was present requesting to see a copy of their tickets in order to enter the stadium parking lot.

70.     The parking lot of the Hard Rock was covered in debris and broken glass.

71.     Defendants had allowed what appeared to be a complete free-for-all block party surrounding the stadium.

72.     At no point in their walk across the Hard Rock property was Plaintiff Martinez asked for a copy of their ticket. Neither was anyone else.

73.     There were no barricades protecting the perimeter surrounding the entrances to the Hard Rock Stadium.

74.     Plaintiff Martinez arrived at the West entrance at 6:45 p.m., over an hour before the match was set to kick off at 8:00 p.m.

75.     When Plaintiff Martinez approached the entrance, he did not find Defendants scanning tickets or controlling the crowds of thousands that had gathered at the entrance. Instead he found the gates shut and locked. All of Defendants employees had locked themselves in the Hard Rock and refused to engage with those on the outside like Plaintiff Martinez and the Class.

76.     At approximately 7:30 p.m. frustrations boiled over and hundreds of unticketed fans rushed the West entrance where Plaintiff Martinez was waiting to be let in. Fearing for their

safety, Plaintiff Martinez and his family led together as the unticketed fans overwhelmed Defendants' non-existent security and made their way into the stadium.

77.     Thereafter, the entrances were again locked and the ticketed fans, such as Plaintiff Martinez and the Class, were left outside the Hard Rock stadium.

78.     At 9:00 pm, Plaintiff Martinez found a police officer, the first one that they had seen outside of the locked Hard Rock gates all night. Plaintiff Martinez asked if the officer could allow them into the Hard Rock and the police officer responded that it would not be safe to enter the stadium and that unticketed fans would be in their seats already.

79.     Plaintiff Martinez returned home where they watched the final minutes of Columbia's loss to Argentina on their television.

80.     As a direct result of Defendants' negligence, Plaintiff Martinez suffered economic damages including $4,395.59 in ticket costs and $50 in travel costs.

**VIII.   Plaintiff Grande's Facts**

81.     Plaintiff Daniel Grande is a life-time fan of football.

82.     Although Plaintiff Grande was not initially planning to attend the Copa America final, on the morning of the game he had the opportunity to purchase last-minute tickets from a broker. In total, Plaintiff Grande paid $9,000 for two tickets located in 72 Club, row 6, seats 5 and 6. In addition, Plaintiff Grande incurred travel related expenses and paid $750 to park at the stadium. A copy of Plaintiff Grande's tickets are attached as **Exhibit B**.

83.     Plaintiff Grande arrived at the stadium and found that there was a 100-foot-tall screen set up for a large watch party in the parking lot. In addition, Plaintiff Grande saw food trucks, vendors selling alcohol, and unticketed people having large parties right next to the entrance.

84.     Plaintiff Grande's tickets were inside of the 72 Club, which is premium seating. Typically, the 72 Club has its own entrance, but at the Copa America Final there were thousands of unticketed persons gathered in front of the 72 Club entrance.

85.     Plaintiff Grande approached the entrance and found that the gates were locked and no persons were being permitted to enter the stadium.

86.     When Plaintiff Grande finally saw a security guard come through the gate, he thought that Defendants were going to start admitted their paid invitees, like Plaintiff Grande and the Class. However, the security guard was removing her polo and stated that she was quitting on the spot.

87.     Around 9:45 p.m., Plaintiff Grande accepted that he was not ever going to be let into the Hard Rock to enjoy the game so he returned home. Plaintiff Grande watched the last moments of the game on his television.

88.     As a direct result of Defendants' negligence, Plaintiff Grande suffered economic damages including $9,000 in ticket costs, $750 in parking expenses, and $50 in travel costs.

## CLASS ALLEGATIONS

89.     Pursuant to Florida Rule of Civil Procedure 1.220(a), (b)(2), and (b)(3), Plaintiffs bring this action on behalf of themselves, and all others similarly situated. The following Class is defined as:

> All residents of the United States who (1) purchased one or more tickets to the Copa America final on July 14, 2024 and (2) were denied entry to Hard Rock Stadium.

90.     The class period is four (4) years before the date this complaint is filed.

91.     Excluded from the Class are persons who purchased the tickets for purposes of resale; any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal

representatives, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families. Plaintiffs reserve the right to redefine the proposed Class and the Subclasses if discovery and further investigation reveal that the Class and Subclasses should be expanded or otherwise modified. Plaintiffs reserve the right to establish additional subclasses as appropriate.

92.     **Numerosity**: The exact number of Class Members is unknown as such information is in the exclusive control of Defendants. However, due to the nature of the trade and commerce involved, and the number of tickets sold by Defendants, Plaintiffs reasonably believe the Class consists of easily thousands of consumers, making joinder of all Class Members impracticable.

93.     **Commonality**: Common questions of law and fact affect the right of each Class Member and common relief by way of damages is sought for Plaintiffs and Class Members. The harm that Defendants have caused by their negligent conduct is substantially uniform with respect to all Class Members. Defendants' negligent conduct in orchestrating an appropriate security plan caused the fans to riot and the gates to eventually be locked which prevented entry into Hard Rock Stadium for Plaintiffs and all Class Members. Common questions of law and fact that affect Plaintiffs and the Class include, but are not limited to:

a.      Whether CONMEBOL owed Plaintiffs and the Putative Class a duty care;

b.      Whether Hard Rock owed Plaintiffs and the Putative Class a duty of care;

c.      Whether it was foreseeable that large crowds would gather at the Hard Rock Stadium;

d.      Whether it was foreseeable that the failure to provide adequate security would result in paying fans, including Plaintiffs and the Putative Class not being permitted to enter the Hard Rock;

e.    Whether CONMEBOL breached its duty of care when it contracted with the Hard Rock to host the Copa America final when Hard Rock failed to provide an adequate security plan;

f.    Whether Hard Rock, together with its employees, and subcontractors, breached the standard of care when it negligently failed to provide security and manage the growing crowd to prevent the breach of its entrances;

g.    Whether Hard Rock, together with its employees, and subcontractors, breached the standard of care when it negligently opened the entrances to allow thousands of persons into the Hard Rock without tickets and prevented paying fans from entering;

h.    Whether Hard Rock, together with its employees, and subcontractors, breached the standard of care when it negligently closed the entrances to the Hard Rock;

i.    Whether Defendants were unjustly enriched by generating tens of millions of dollars of revenue from Plaintiffs and the Putative classes purchase of tickets;

j.    Whether, as a result of Defendants' misconduct as alleged herein, Plaintiffs and the Class are entitled to damages, restitution and/or other remedies to which Class and Subclasses members are entitled as a result of Defendants' wrongful conduct, and, if so, the amount and nature of such relief;

k.    Whether Defendants owed a duty to Plaintiffs and Class Members to safeguard their ticketed seats;

l.    Whether Defendants owed a duty to provide reasonable and adequate security protocols for the Copa America Final Match;

m.    Whether Defendants denied ticketed fans like Plaintiffs and the Class Members entry to the Copa America Final Match;

n.    Whether the Defendants were negligent in failing to adequately secure the Hard Rock Stadium;

o.    Whether Defendants breached their duty to Plaintiffs and the Class;

p.    Whether Defendants failed to take reasonable and prudent security measures;

q.    Whether Defendants' security and safety protocols and systems prior to and during the Final Match were consistent with industry standards;

r.    Whether Defendants knew or should have known that its security protocols were deficient;

s.    Which security procedures Defendants should be required to implement;

t.    Whether Defendants were unjustly enriched by unlawfully retaining a benefit conferred upon them by Plaintiffs and Class Members;

u.    Whether Defendants' conduct, including its alleged failure to act, resulted in or was the proximate cause of the monetary harm suffered by Plaintiffs and the Class Members; and

v.    Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or declaratory relief.

94.    **Typicality**: The claims and defenses of Plaintiffs are typical of the claims and defenses of the Class because Defendants denied entry of ticketed fans into the Hard Rock Stadium, controlled the gates and seats, permitted unticketed fans to enter the Hard Rock Stadium and surrounding area, and Plaintiffs and the Class Members' tickets were compromised as a result of Defendants actions or inaction. Plaintiffs sustained damages akin to damages sustained by Class

Members arising out of and caused by Defendants' common course of conduct in violation of laws and standards as alleged herein.

95.    **Adequacy**: Plaintiffs will fairly and adequately assert and protect the interests of the Class. First, Plaintiffs have hired attorneys who are experienced in prosecuting class action claims within the State of Florida and across the United States, and who will adequately represent the interests of the Class. Second, Plaintiffs have no conflict of interest that will interfere with the maintenance of this class action as their claims are the same as the Class Members they seek to represent. Further, Plaintiffs understand their obligations to the Class, is committed to vigorously litigating this matter, and will fairly and adequately protect and represent the interests of the Class.

96.    The common questions of law and fact set forth herein predominate over any questions affecting only individual Class Members. A class action provides a fair and efficient method for the adjudication of this controversy for these reasons and is superior to the alternative methods involved in individual litigation. The events that took place during the Final Match all occurred on one day and were all caused by the actions or inactions of Defendants. Common questions predominate regarding the conduct that led up to the Final Match and after.

97.    Although the Class is numerous enough to meet the numerosity requirement, the proposed Class does not create manageability problems because the claims turn on common legal determinations. Either Defendants' were negligent or they were not. Either Defendants collected money from Plaintiffs and the Class in exchange for Final Match tickets and then denied entry to the Hard Rock Stadium which resulted in Defendants unjust enrichment or it did not. There are no unusual legal or factual issues that would create manageability problems as the issues turn on interpretation of Defendants' security measures, actions and/or inaction, and its standards and

reasonableness of its conduct leading up to the Final Match in relation to others in similar instances.

98.     Prosecution of separate actions by individual members of the Class would create a risk of inconsistent and varying adjudications against Defendants when confronted with incompatible standards of conduct.

99.     Despite the sizeable sum of money unlawfully collected and retained by the Defendants, the claims of the individual Class Members are, nevertheless, small in relation to the expenses of individual litigation, making a class action the only procedural method of redress in which Class Members can, as a practical matter, recover their damages and stop the illegal practices at issue.

100.    Class Members are readily identifiable and ascertainable given the nature of Defendants' business practices and using its business records and ticket technology.

## **COUNT I**
### **Negligence**
### **(On Behalf of Plaintiffs and the Class)**

101.    Plaintiffs repeats and re-alleges the allegations set forth in paragraphs 1-100, as if set forth fully herein.

102.    Defendants collected payments from Plaintiffs and the Class Members in exchange for tickets to the Final Match as part of the entertainment business they agreed to operate jointly, which affects commerce.

103.    Plaintiffs and Class Members entrusted Defendants with the understanding that the money they paid to Defendants would permit them to enter the Hard Rock Stadium for the Final Match and that their tickets would be safeguarded.

104.    Defendants had full knowledge of the expense and sensitivity of the tickets and the

types of harm that Plaintiffs and Class Members could and would suffer if their seats were stolen or if they were prevented them from using the tickets.

105.    It was reasonably foreseeable to Defendants that Plaintiffs and the Class Members would suffer such harms in light of similar chaos experienced at other similar football events, such as the mayhem experienced at the Semi Final Match here.

106.    Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, and protecting access to the stadium and protecting their tickets and seating in Defendants' possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons.

107.    Defendants owed a duty to Plaintiffs and Class Members to provide reasonable security, consistent with industry standards and requirements, and to ensure that its security and safety protocols, and the personnel responsible for them, adequately protected Plaintiffs' and Class Members' tickets and legal right to enter the Hard Rock Stadium.

108.    Defendants also had a special relationship with Plaintiffs and each of the Class Members as ticketed invitees. That special relationship arose because Defendants were entrusted with their safety and security as a necessary part of the services rendered by Defendants. That special relationship provides an additional basis on which Defendants owed a duty to Plaintiffs and each of the Class Members to protect against unauthorized access to, theft of, and/or disclosure of their tickets and seating and to protect their right to enter the Hard Rock Stadium.

109.    Defendants owed a duty to Plaintiffs and Class Members to design, maintain, and test their safety and security systems and protocols to ensure that all tickets and entry points in their possession or control were adequately secured and protected.

110.    Defendants owed a duty to Plaintiffs and Class Members to create and implement

reasonable security practices and procedures to protect all ticketed persons in their possession or control, including not compromising their tickets, seating, or access to the Hard Rock Stadium, or entrusting security to other entities who maintain substandard security systems.

111.    Defendants owed a duty to Plaintiffs and Class Members to implement and maintain security processes that would immediately detect a breach of their security systems in a timely manner.

112.    Defendants owed a duty to Plaintiffs and Class Members to act upon security warnings, prevent them and/or alert them in a timely fashion.

113.    Defendants owed a duty to Plaintiffs and Class Members to disclose in timely fashion of any security breach and security practices that were inadequate in any way to safeguard individuals' persons, tickets, and seating, including from theft from unticketed fans.

114.    Defendants owed a duty to Plaintiffs and Class Members to reliably plan and/or implement security standards to keep Plaintiffs and Class Members' safe from unticketed fans.

115.    Defendants owed a duty to Plaintiffs and Class Members to monitor fan behavior and activity to identify possible threats to the security and integrity of the Hard Rock Stadium prior to and during the Final Match.

116.    Defendants owed a duty to Plaintiffs and Class Members to promptly and adequately notify Plaintiffs and Class Members of the Breach, and a reasonably prudent company similarly situated would have postponed the event until a later date to ensure adequate security and safety of ticketed persons.

117.    Plaintiffs and the Class Members were the foreseeable invitees and probable victims of any inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in creating, collecting, selling, protecting, planning, and the critical

importance of providing adequate security to Plaintiffs and the Class Members' tickets, seating, and person, and the necessity for safeguarding safe access to the stadium.

118.    Defendants were in a position to protect against the harm suffered by Plaintiffs and the Class Members as a result of their failure to provide adequate security. Defendants' duties extended to protecting Plaintiffs and the Class Members from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. See Restatement (Second) of Torts § 302B.

119.    Defendants failed to perform these duties by failing to reasonably and adequately secure their premises and systems against unticketed fans.

120.    But for Defendants' wrongful and negligent breaches of the duties owed to Plaintiffs and the Class Members, Plaintiffs and Class Members would have gained safe access to the Stadium to enjoy the Final Match that they paid to attend.

121.    There is a close causal connection between Defendants' failure to implement security measures to protect Plaintiffs' and Class Members' tickets and the harm suffered by Plaintiffs and the Class Members.

122.    As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class Members have suffered injury by way of payment for tickets which could not be used because of Defendants prohibited their use and access, the value of their tickets, travel accommodations, and other forms of monetary damages connected to attending the Final Match.

123.    Plaintiffs and Class Members are entitled to actual and liquidating damages suffered as a result of the Defendants' breach of its duty.

124.    Defendants' negligent conduct is ongoing, in that Plaintiffs' and Class Members'

have never been fully compensated for the cost of their tickets, travel, and interest on money that Defendants borrowed.

### COUNT II
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

125.    Plaintiffs re-allege and re-incorporate paragraphs 1-100 as fully set forth herein.

126.    This count is plead in the alternative to the breach of implied contract claim above.

127.    Plaintiffs and Class Members conferred a monetary benefit on Defendants in connection with obtaining its products and services, specifically providing payment to Defendants. In exchange, Plaintiffs and Class Members should have received from Defendants services or products that were the subject of the transaction and should have had their Final Match tickets protected with adequate security.

128.    Defendants knew that Plaintiffs and Class Members conferred a benefit upon them and accepted and retained that benefit by accepting and retaining their money.

129.    Defendants profited from Plaintiffs' and Class Members' money paid in exchange for Final Match tickets.

130.    Defendants profited from Plaintiffs' and Class Members' money paid in exchange for Final Match tickets.

131.    Defendants failed to take action and update their security systems and protocols to secure Plaintiffs' and Class Members' tickets, seating, and entry into the Hard Rock Stadium and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their tickets provided when Defendants denied them entry into the Final Match.

132.    Defendants acquired Plaintiffs' and Class Members' money through inequitable means as they failed to disclose the inadequate security practices previously alleged.

133.    Had Plaintiffs and Class Members known that Defendants would not use adequate security practices, procedures, and protocols to adequately monitor, supervise, and secure their premises, or properly train their employees or third parties in charge of providing security, they would not have given their money to attend the Final Match.

134.    Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiffs and Class Members conferred upon them.

135.    As a direct and proximate result of Defendants' conduct, Plaintiffs and the Class Members have suffered an injury.

136.    Plaintiffs and Class Members are entitled to restitution and/or damages from Defendants and/or an order proportionally disgorging profits, benefits, and other compensation obtained by Defendants as a result of its wrongful conduct, as well as the return of their money related to ticket purchases, interest and related travel costs.

137.    This can be accomplished by establishing a constructive trust from which the Plaintiffs and Class Members may seek restitution or compensation.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in their favor and in favor of the Class, and against Defendants for:

a.      an order certifying this case to proceed as a class action, designating Plaintiffs as the Class representative, and designating the undersigned attorneys as Class Counsel;

b.      actual damages;

c.      interest;

d.      liquidating damages related to travel expenses;

e.      alternatively, disgorgement of Defendants' profits; and

f.    such further relief as this Court may deem appropriate.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury on all issues so triable.

Dated: July 24, 2024                     Respectfully submitted,

**VARNELL & WARWICK, P.A.**

/s/ Jeffrey L. Newsome
Jeffrey L. Newsome; FBN: 1018667
Janet R. Varnell; FBN: 0071072
Brian W. Warwick; FBN: 0605573
Christopher J. Brochu; FBN: 1013897
Pamela G. Levinson, FBN: 538345
400 N Ashley Drive, Suite 1900
Tampa, FL 33602
Telephone: (352) 753-8600
Facsimile: (352) 504-3301
jnewsome@vandwlaw.com
jvarnell@vandwlaw.com
bwarwick@vandwlaw.com
cbrochu@vandwlaw.com
plevinson@vandwlaw.com
ckoerner@vandwlaw.com

**LAW OFFICE OF IRWIN AST**
/s/ Irwin Ast
Irwin Ast; FBN: 0059879
Leonard M. Caracappa; FBN: 1018504
2121 S.W. 3rd Avenue, Suite 401
Miami, Florida 33129
Tel:    (305) 307-5208
Fax:    (305) 901-5639
*irwin@astlawfirm.com*
*leo@astlawfirm.com*
*pleadings@astlawfirm.com*

***Attorneys for Plaintiff and the Proposed Class***

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 24, 2024, I electronically filed the foregoing document with the Clerk of Court using the Florida Courts E-Filing Portal. I also certify that the foregoing document is being served this day on all counsel of record and interested parties, via transmission generated by the Florida Courts E-Filing Portal.

<u>/s/ Jeffrey L. Newsome</u>
Jeffrey L. Newsome

# EXHIBIT A

← **Transactions**   🔍   ▼

Jun 11, 2024

May 25, 2024

May 17, 2024

| Ticketmaster | $4,395.59 |
| Entertainment | |

May 10, 2024

# EXHIBIT B

 **Gmail**

**Danny Grande** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

## James Just Sent You 2 Hard Rock Stadium Tickets

**Miami Dolphins** <noreply@ticketmaster.com>                    Sun, Jul 14, 2024 at 11:01 AM
Reply-To: customerservice@dolphins.com
To: Danny Grande ▓▓▓▓▓▓▓▓▓▓▓▓

                                         **My Account**

# It's Time: Accept Your Tickets Now

James just sent you 2 Hard Rock Stadium tickets.

**Accept Tickets**

Accept by Mon • Jul 15, 2024 • 08:00 AM

## How to Accept Your Transfer

---

1 | On your smartphone, tap the Accept Tickets button above.

2 | Sign in to the Miami Dolphins  or  Miami Dolphins app using your Ticketmaster email and password, or create an account, to accept your tickets.

3 | Keep an eye out for a follow-up email with instructions on how to view and save your tickets for the big day.

## Transferred Tickets (2)



### Copa America Final

Sun • Jul 14, 2024 • 08:00 PM

Hard Rock Stadium Miami, FL

**Section 72CLUB, Row 13, Seat 5**

**Section 72CLUB, Row 13, Seat 6**

## Questions?

**Visit Help Center**